BROWN v BROWN

Docket No. 256691. Submitted January 4, 2006, at Lansing. Decided
April 25, 2006, at 9:05 a.m. Leave to appeal sought.

Lisa Brown brought an action in the Wayne Circuit Court against
Michael Brown and others, including Samuel Whittar Steel, Inc.
(Whittar). The plaintiff had been assigned by her employer to work
at Whittar's plant as a security guard. Michael Brown, who worked
for Whittar as a foreman, had sexually assaulted the plaintiff while
both were on duty and had subsequently pleaded no contest to
attempted third-degree criminal sexual conduct. The plaintiff's
action asserted theories of vicarious liability and negligence
against Whittar for Michael Brown's assault. The court, Edward
M. Thomas, J., granted Whittar summary disposition, concluding
that the crime was not in the scope of Michael Brown's employ-
ment. The plaintiff appealed.

The Court of Appeals *held*:

The trial court erred when it granted summary disposition on
the plaintiff's negligence claim against Whittar, the only claim at
issue on appeal. Generally, a person, including an employer, has no
duty to protect an individual who is endangered by a third person's
conduct. An employer, however, may share liability for intentional
torts committed by an employee who is acting beyond the scope of
employment if the employer knew, or should have known, of the
employee's violent propensities. While there was no evidence that
Michael Brown had any history of criminal convictions or violent
acts, he made a number of sexually aggressive and predatory
statements to the plaintiff, which she reported to Whittar's plant
manager. Even though the plaintiff indicated that she did not fear
violence from Michael Brown before he assaulted her, the language
used and the circumstances surrounding it were sufficient to
create a jury question regarding whether Whittar knew or should
have known of Michael Brown's propensity for sexual violence. It
is not necessary that an employer know that the employee had a
propensity to commit the actual crime that occurred. Rather, it is
sufficient if the employer knew of the employee's impropriety,
violence, or disorder, that is, if the employer could reasonably

have foreseen the employee's violent propensity, which is the employee's natural inclination or tendency to violence.

Reversed and remanded for further proceedings.

MASTER AND SERVANT — DUTY TO PROTECT THIRD PERSONS — VIOLENT PROPENSITIES OF EMPLOYEES.

An employer may share liability for an intentional tort committed by an employee who is acting beyond the scope of employment if the employer knew, or should have known, of the employee's violent propensities; sexually aggressive and predatory statements by an employee may be sufficient to put an employer on notice of the employee's propensity for violence even without a history of criminal convictions or violent acts; it is not necessary that the employer know that the employee had the propensity to commit the actual crime that occurred; rather, it is sufficient if the employer knew of the employee's impropriety, violence, or disorder, that is, if the employer could reasonably have foreseen the employee's violent propensity, which is the employee's natural inclination or tendency to violence.

*Weaver & Young, P.C.* (by *Gregory T. Young*), for Lisa Brown.

*Plunkett & Cooney, P.C.* (by *Christine D. Oldani, Frank W. Brochert*, and *Camille T. Horne*), for Samuel Whittar Steel, Inc.

Before: METER, P.J., WHITBECK, C.J., and SCHUETTE, J.

PER CURIAM. Plaintiff Lisa Brown appeals as of right the circuit court's order granting summary disposition to defendant Samuel Whittar Steel, Inc. (Whittar). We reverse.

### I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from a sexual assault that took place on Whittar's premises. Lisa Brown was employed by a security company and assigned to Whittar as a security guard. Defendant Michael Brown (no relation to Lisa

Brown) worked for Whittar as a foreman. Lisa Brown alleged that while both were on duty, Michael Brown sexually assaulted her.

Michael Brown was charged with criminal sexual conduct in the third degree,[1] but, pursuant to an agreement, pleaded no contest to a reduced charge of attempted third-degree criminal sexual conduct. In that proceeding, Michael Brown's lawyer agreed with the prosecutor's assertion that "on the date of November 17th of the year 2000 at the address of 20001 Sherwood Avenue in the City of Detroit, . . . the defendant, Michael Brown, did attempt to forcibly put his penis into the vagina of Lisa Brown."

Lisa Brown commenced a civil suit, pursuing Whittar on theories of vicarious liability and negligence for Michael Brown's assault and battery. Whittar moved for summary disposition, but the trial court initially denied the motion on the ground that "for purposes of this motion, . . . Whittar was on notice that there was a likelihood that [Lisa Brown] could have been in danger with Michael Brown because she had reported it three times to them."

Just before trial, however, the trial court granted Whittar's renewed motion for summary disposition. The trial court stated as follows:

> The ultimate question for this Court is whether or not the employer, Whittar Steel is liable for the unforeseen criminal acts of an employee. . . .
>
> Based upon everything that I have read with regard to this case including the testimony of [Lisa Brown], the Court is of the opinion that the employment of [Michael] Brown merely gave rise to an opportunity to commit the crime. [I]t was not within the scope of his employment as

---

[1] MCL 750.520d.

has been conceded by [Lisa Brown's] counsel. There was no benefit to Whittar Steel.

In terms of [Michael] Brown raping [Lisa Brown], it [was] purely for his own personal interest and gratification and had nothing to do with the business of the employer. That being the situation, the Court is of the opinion that as it relates to the Whittar Steel, the motion for summary disposition should be and it is granted. There is no genuine issue of material fact.

## II. VICARIOUS LIABILITY

### A. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition.[2] "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial."[3]

### B. SCOPE OF EMPLOYMENT

Lisa Brown states in her brief on appeal that she is not appealing her claim relating to the agency relationship between Michael Brown and Whittar, yet she refers to that doctrine in the course of framing her sole issue on appeal. However, this is not a civil rights action concerning sexual harassment. Rather, it is one involving claims of common-law negligence and assault and battery. In the argument section of her brief on appeal, Lisa Brown nowhere asserts that, let alone explains how, Michael Brown's sexual aggression against her fell

---

[2] *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003).

[3] *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004).

within the scope of his employment.[4] In fact, Lisa Brown's attorney in this case explicitly conceded that "raping somebody is outside of the scope of employment." For these reasons, we will consider Lisa Brown's arguments on appeal only in connection with her negligence claim against Whittar.

### III. NEGLIGENCE

#### A. STANDARD OF REVIEW

As stated above, we review de novo a trial court's decision on a motion for summary disposition,[5] and in reviewing a motion under MCR 2.116(C)(10), we consider the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial.[6]

#### B. ELEMENTS OF ACTIONABLE NEGLIGENCE

In order for a plaintiff to establish a prima facie case of negligence, the plaintiff must prove four elements: that the defendant owed a duty to the plaintiff, that the defendant breached that duty, that the defendant's breach of duty was the proximate cause of the plaintiff's damages, and that the plaintiff suffered damages.[7]

---

[4] "An employer is liable for the intentional tort of his employee if the tort is committed in the course and within the scope of the employee's employment." *Bryant v Brannen*, 180 Mich App 87, 98; 446 NW2d 847 (1989). Accordingly, "[a]n employer is not liable ... if the employee does the act while engaged in the employer's work, but outside of his authority." *Id*.

[5] *Dressel, supra* at 561.

[6] *Walsh, supra* at 621.

[7] *Chivas v Koehler*, 182 Mich App 467, 475; 453 NW2d 264 (1990).

Generally, an individual—and presumably an individual employer or corporate employer—has no duty to protect another who is endangered by a third person's conduct.[8] The existence of a duty is a question of law for the court to decide.[9]

### C. THE "VIOLENT PROPENSITY" EXCEPTION

#### (1) *HERSH*

There are circumstances, however, in which an employer has a duty to protect an individual from harm by an employee. In particular, as the Supreme Court outlined in *Hersh v Kentfield Builders, Inc*, an employer may share liability for intentional torts committed by an employee who is acting beyond the scope of employment if the employer knew, or should have known, of the employee's violent propensities.[10]

*Hersh* involved a situation in which Benton Hutchinson, an employee of the defendant Kentfield Builders, attacked the plaintiff, Melvin Hersh, while Hersh was visiting a model home to keep a business appointment with Kentfield Builders's president.[11] Hutchinson had a criminal record, about which Kentfield Builders had some knowledge,[12] and he was later committed to a hospital for the criminally insane.[13]

The Supreme Court, in reversing the Court of Appeals, quoted headnote 2 of *Bradley v Stevens*[14] for the proposition that

---

[8] *Murdock v Higgins*, 454 Mich 46, 54; 559 NW2d 639 (1997).

[9] *Id.* at 53.

[10] *Hersh v Kentfield Builders, Inc*, 385 Mich 410, 412-413; 189 NW2d 286 (1971).

[11] *Id.* at 411.

[12] *Id.* at 413.

[13] *Id.* at 412.

[14] *Bradley v Stevens*, 329 Mich 556; 46 NW2d 382 (1951).

"[a]n employer who knew or should have known of his employee's propensities and criminal record before the commission of an intentional tort by employee upon customer who came to employer's place of business would be liable for damages to such customer."[15]

The Supreme Court also quoted § 9 of 34 ALR2d 372, 390 as indicating that

"[t]he employer's knowledge of past acts of impropriety, violence, or disorder on the part of the employee is generally considered sufficient to forewarn the employer who selects or retains such employee in his service that he may eventually commit an assault, although not every infirmity of character, such, for example, as dishonesty or querulousness, will lead to such result."[16]

Thus, under *Hersh*, with respect to an employee with a criminal record, possibly even involving a "crime of violence," about which the employer had some knowledge, "[w]hether the employer knew or should have known of [an employee's] vicious propensities should not be determined by any court as a matter of law, but by the jury."[17]

### (2) COURT OF APPEALS CASES

This Court has also considered the violent propensity exception. In *Samson v Saginaw Professional Bldg, Inc*,[18] a divided panel dealt with a situation in which plaintiff Carol Samson, an employee of an attorney with offices in a building owned by defendant Saginaw Professional Building, Inc., was attacked with a knife by

---

[15] *Hersh, supra* at 412.

[16] *Id.* at 413.

[17] *Id.* at 415.

[18] *Samson v Saginaw Professional Bldg, Inc*, 44 Mich App 658; 205 NW2d 833 (1973), aff'd 393 Mich 393 (1975).

Donald Butzin.[19] Butzin was an outpatient of another tenant of the building, the Saginaw Valley Consultation Center. Butzin had previously used a knife in another attack and had been sent to a juvenile home as well as being committed to the Traverse City State Hospital.[20] To paraphrase the dissent, the issue before this Court was whether the corporate defendant, Saginaw Professional Building, Inc., knew or should have known of Butzin's "vicious propensities."[21]

The majority, while acknowledging that the relationship between the parties was tangential, that the causation chain was attenuated, and that the situation involved the "quagmire of *foreseeability*,"[22] found that the "the developing case law in this area" supported imposition of a duty on Saginaw Professional Building, Inc.[23] The majority found that the leasing agent and the principal stockholder of Saginaw Professional Building, Inc., "had actual knowledge that mental patients would visit the Saginaw Consultation Center daily for treatment."[24] Further, the leasing agent conceded that female workers in the building were fearful and apprehensive about the patients' presence in the building.[25] The majority reasoned that common knowledge "that assaults and homicides are committed by mental patients while on convalescent leave" should have placed Saginaw Professional Building, Inc., on notice "that a possible dangerous condition may exist."[26] The majority went on to state:

---

[19] *Id.* at 671 (DANHOF, P.J., dissenting).

[20] *Id.* at 672.

[21] *Id.*

[22] *Id.* at 661 (emphasis in original).

[23] *Id.* at 667.

[24] *Id.* at 663.

[25] *Id.*

[26] *Id.* at 663-664.

> Many patients are simply mentally deficient or re-
> tarded and present no unreasonable threat to the com-
> munity in which they are released. Others possessing a
> propensity for violence, as evidenced by prior violent
> conduct toward others, may present a hazard. The fact
> that the consultation center would be treating mental
> patients and the fact that those patients with a propen-
> sity to be violent present a risk created sufficient knowl-
> edge to require defendant to inquire further to deter-
> mine the type of patients that would visit its building
> with regularity. After evaluating the competing consid-
> erations, we do not find that such inquiry created an
> undue burden upon defendant. The present record indi-
> cates that defendant absolutely failed to make such
> further inquiry and this failing may well be sufficient to
> support a finding of negligence. Had defendant con-
> ducted such inquiry the risk would have become suffi-
> ciently foreseeable to reveal defendant's duty to ad-
> equately protect the employees of other tenants on the
> premises.[27]

Thus, in *Samson* there was no indication that Saginaw
Professional Building, Inc., actually knew of Butzin's
past violent acts or of his incarceration or commitment.
Nevertheless, the majority found that "[w]hether the
assault by a mental patient with a history of violence
was a reasonably foreseeable consequence of [Saginaw
Professional Building, Inc.'s] failure to discover that a
tenant was treating mental patients with such histories
and to take reasonable precautions . . . was a question
for the jury."[28]

Several years later, however, another panel of this
Court had an entirely different take on a somewhat
similar situation. In *Tyus v Booth*, Flozelle Nails, an
employee at a service station owned by the defendant,
Tom Booth, committed unprovoked assaults on the

---

[27] *Id*. at 664-665.

[28] *Id*. at 669.

plaintiffs, Bernard and Robert Tyus.[29] Apparently, Nails had a criminal record. However, there was no evidence that Booth actually knew of Nails's prior assault convictions.[30] The trial court dismissed the Tyuses' negligence action, and this Court upheld that dismissal, holding that an employer is not obliged to "conduct an in-depth background investigation of his employee" to discover whether there is a history of violent propensities.[31] Rather, "[t]he duty is to use reasonable care to assure that the employee known to have violent propensities is not unreasonably exposed to the public."[32] Thus, while *Samson* imposed a duty of further inquiry under the factual circumstances of that case, *Tyus* imposed no such duty even though the employee in *Tyus* who committed the violent acts in question also apparently had some history of such violent acts.

### D. DELINEATING THE ISSUE

The factual circumstances of this case are considerably different from the preceding cases. There is no evidence that we can find in the record that Michael Brown had any criminal convictions or any history of prior violent acts. Rather, Lisa Brown's theory of liability is premised not on what Michael Brown did to other women in the past or, indeed, even what he did to her in the past. Rather, Lisa Brown premises her negligence action on the theory that Whittar knew or should have known of Michael Brown's propensity for violence on the basis of what he *said* to her.

---

[29] *Tyus v Booth*, 64 Mich App 88, 89; 235 NW2d 69 (1975).

[30] *Id.* at 91.

[31] *Id.* at 92.

[32] *Id.*

In this regard, Lisa Brown alleges that Michael Brown made a number of sexually aggressive and predatory statements to her, statements that she reported to Whittar's plant manager, Harlan Gardner. Specifically, Lisa Brown stated in her deposition that Michael Brown said that he "would want to f—k me and pull my long hair," that "[h]e liked how I shaked my ass," and that "I had big tits and just all the terrible things like that."

However, Lisa Brown also indicated that she feared no violence from Michael Brown up to the moment the sexual assault occurred. She testified that, despite having complained about Michael Brown's sexually suggestive comments, she was not concerned that he would physically assault her. Thus, Lisa Brown is asserting that Whittar should have recognized and protected her from the hazard of Michael Brown's sexual predations at a time when she herself apparently felt no such threat.

Further, we note that we must resist the trap of fallacious reasoning that because Michael Brown sexually assaulted Lisa Brown, Whittar must have known of his propensity for violence. Rather, we must determine whether, on the basis of Michael Brown's words—and his words alone—before the assault, Whittar knew or should have known of Michael Brown's violent propensities. Thus, the situation here is unlike that in *Hersh*, *Samson*, and *Tyus*, in which the employees who committed the assaults all had a history of prior violent *acts*. We must decide, in a case of first impression, whether sexually aggressive and predatory *words* are sufficient to put an employer on notice of its employee's propensity for violence.

The crude comments made by Michael Brown to Lisa Brown did not have time certainty associated with

them. Most would agree, for example, that had Michael Brown said to Lisa Brown, "The next time we are alone, I'm going to rape you," and had Lisa Brown immediately reported this threat to the plant manager, these words, although accompanied by no overt act, would be sufficient to put Whittar on notice of Michael Brown's violent propensities. But Michael Brown did not use these words. Rather he said that he "would want to f—k" Lisa Brown and pull her long hair, that he "liked how [she] shaked [her] ass," and that she "had big tits" and "all the terrible things like that." The narrow question before us, therefore, is whether *these* words, after Lisa Brown reported them, were sufficient to put Whittar on notice of Michael Brown's violent propensities.

In deciding this question, we acknowledge that derogatory comments about women and crude sexual references about women are, unfortunately, made at times in our society.

However, in this case, we find that the language and the circumstances were sufficient to create a jury question regarding whether Whittar knew or should have known of Michael Brown's violent propensities. Although Michael Brown, before the assault, apparently never touched Lisa Brown, he told her in graphic terms what he liked about her sexually and what he wanted to do to her sexually. He made these statements repeatedly, and he made them from a position of power as a foreman in Whittar's plant. His words were redolent with crude sexual aggression, and he used them with apparent reckless disregard of the consequences. There is no question that Lisa Brown was sufficiently alarmed that she reported Michael Brown's statements to Whittar's plant manager.

Clearly, Lisa Brown did not specifically foresee that Michael Brown would sexually assault her. Had she

been able to predict the future, the assault likely would never have occurred. But there is no requirement that Lisa Brown be able to predict the future. Nor is there a requirement, in *Hersh* or elsewhere, that an employer must know that the employee had a propensity to commit the actual crime that occurred. Rather, it is sufficient under *Hersh* if the employer knew of the employee's "impropriety, violence, or disorder,"[33] in short, whether the employer could have reasonably foreseen the employee's "violent propensity," that is, his or her "natural inclination or tendency" to violence.[34] Given what Michael Brown said to Lisa Brown and what Lisa Brown reported to Whittar's plant manager, we conclude that a jury could find that Whittar should have, under these circumstances, known of Michael Brown's propensity for sexual violence. There was, therefore, a genuine issue of material fact, and the trial court erred when it granted summary disposition on Lisa Brown's negligence claim. The question whether Whittar knew or should have known of Michael Brown's vicious propensities should not have been determined by the trial court as a matter of law, but by the jury.[35]

Reversed and remanded for further proceedings. We do not retain jurisdiction.

---

[33] *Hersh, supra* at 413.

[34] See *Random House Webster's College Dictionary* (2001), which defines "propensity" as "a natural inclination or tendency."

[35] See *Hersh, supra* at 415. See also *Duran v Furr's Supermarkets, Inc,* 921 SW2d 778, 790-791 (Tex App, 1996) (concluding that a factual question was raised regarding whether knowledge of the employee's prior use of abusive language would put a reasonable person on notice that the employee's verbal abuse of a store patron might escalate into a physical assault). But see *Thatcher v Brennan,* 657 F Supp 6, 11 (SD Miss, 1986) ("It is not sufficient that the plaintiff prove a mere possibility of violence. . . . Rather, there must be proof that the employee/assailant was a person of known vicious character or one whom the employer should have known had a vicious character.").